UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 24 Cr. 300 (DEH) |
| CHRISTOPHER CARRINGTON WHITE, | |
| Defendant. | |

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Benjamin M. Burkett
Assistant United States Attorney
*Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................................... 1

FACTUAL BACKGROUND......................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    The Defendant's Motion to Dismiss the Indictment Based on *Bruen* Should Be Denied... 2

        A.    *Bogle*, *Heller*, and *McDonald* All Confirm the Constitutionality of Section 922(g)(1)'s Prohibition on the Possession of Firearms by Felons ........................................................ 3

        B.    *Bruen* Does Not Undermine Section 922(g)(1) or *Bogle* ............................................. 5

        C.    Text and History Confirm that Section 922(g)(1) Is Consistent with the Second Amendment .............................................................................................................................. 12

        D.    The Defendant Falls Squarely Within the Historically Excludable Class.................. 27

    CONCLUSION...................................................................................................................... 31

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Christopher Carrington White's motion to dismiss the Indictment (Dkt. 27 ("Def. Br.")), which charges the defendant with one count of possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). For the reasons set forth below, the defendant's motion is meritless and should be denied.

## FACTUAL BACKGROUND[1]

On May 19, 2023, at approximately 1:40 a.m., officers of the New York City Police Department ("NYPD") (the "NYPD Officers"), who were in a vehicle, observed the defendant standing in front of a storefront in the vicinity of East 228th Street and White Plains Road in the Bronx, New York. The defendant was wearing a light-colored hoodie and dark-colored jeans. One of the NYPD Officers ("Detective-1") could see an L-shaped object weighing down the front pocket of the defendant's hoodie.

The NYPD Officers exited their vehicle and approached the defendant. As the NYPD Officers approached the defendant, the defendant fled.

The NYPD Officers ran after the defendant. Within seconds of starting to run, the defendant extended his right arm and threw an object over a fence, into a vacant lot. The defendant eventually dropped to the ground, and he was placed under arrest.

Detective-1 returned to the vacant lot around where the defendant appeared to have thrown the object. After determining that the fence surrounding the lot was locked, Detective-1 scaled the fence and landed in what appeared to be a mostly empty lot. Detective-1 looked around the lot,

---

[1] This summary is provided for background and context but does not constitute a complete proffer of all of the Government's expected trial evidence.

aided by a flashlight, and saw a firearm (the "Firearm") in the vicinity of where the defendant appeared to have thrown the object.

Law enforcement later determined that the Firearm was a Smith and Wesson 9mm handgun, model M&P 9 Shield, which contained five bullets, including three Federal Cartridge 9mm Luger bullets.

The NYPD's Evidence Collection Team took swabs of DNA from the Firearm. On November 16, 2023, law enforcement took swabs of the defendant's DNA pursuant to a judicially authorized search warrant. Those swabs were submitted to The New York City Office of the Chief Medical Examiner to be compared to the swabs taken from the Firearm. The resulting analysis showed that it was 944 billion times more likely than not that the defendant was one of the contributors to the mixture of DNA present in that swab.

The defendant has previously been convicted of two felony offenses: burglary in the third degree: illegal entry with intent to commit a crime, in violation of New York Penal Law § 140.20; and robbery in the third degree, in violation of New York Penal Law § 160.05.

## ARGUMENT

### I. The Defendant's Motion to Dismiss the Indictment Based on *Bruen* Should Be Denied

The defendant moves to dismiss the Indictment, arguing that his possession of a loaded firearm after a prior felony conviction is protected by the Second Amendment and that Section 922(g)(1) is unconstitutional both facially and as applied to him. (Def. Br. at 4-6).

The United States Constitution does not consign society to suffer the arming of felons, and the Supreme Court's Second Amendment jurisprudence, including its decisions in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), does not suggest otherwise. To the contrary, the Supreme Court has repeatedly emphasized

that statutes barring felons from possessing guns are presumptively constitutional, and the controlling decision in this Circuit, *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013), upholds the constitutionality of the very statute that the defendant attacks. *Rahimi* and *Bruen* do nothing to undermine *Bogle*. *See United States v. Young*, No. 20-CR-391 (RA), 2024 WL 3184709, at *3-4 (S.D.N.Y. June 25, 2024) (holding that *Bogle* remains good law following *Bruen* and *Rahimi*). And there is no support for the defendant's argument that a repeat felon—the defendant has multiple previous felony convictions, including one for burglary in the third degree: illegal entry with intent to commit a crime, in violation of New York Penal Law § 140.20, and one for robbery in the third degree, in violation of New York Penal Law § 160.05—has a Second Amendment right to possess a firearm and ammunition. Guided by the Supreme Court's numerous statements about the constitutionality of prohibitions on the possession of firearms by felons, and bound by the Second Circuit's holding in *Bogle*, every judge in this District who has considered a post-*Bruen* challenge to Section 922(g)(1) has reaffirmed its constitutionality. This Court should do the same here.

Finally, the Court should reject the defendant's as-applied challenge because he is not entitled to bring one and, even if he were, his prior felonies demonstrate that he falls squarely within the class of persons who can be constitutionally and permanently prohibited from carrying guns and ammunition. In sum, the defendant's motion is meritless and should be denied.

### A. ***Bogle*, *Heller*, and *McDonald* All Confirm the Constitutionality of Section 922(g)(1)'s Prohibition on the Possession of Firearms by Felons**

The Supreme Court has reiterated, time and again, that its decisions interpreting the Second Amendment "d[o] not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)); *see also Bruen*, 597

U.S. at 81 (Kavanaugh, *J.*, concurring) (confirming that the Supreme Court's decision in *Bruen* specifically allows the "longstanding prohibitions on the possession of firearms by felons" blessed in *Heller* and *McDonald*); *Rahimi*, 144 S. Ct. at 1902 (reaffirming *Heller*'s statement that "many [] prohibitions [on the right to possess firearms in the home], like those on the possession of firearms by felons and the mentally ill, are presumptively lawful").

Based on the Supreme Court's "emphasi[s] that recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" the Second Circuit held that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons." *Bogle*, 717 F.3d at 281-82 (quoting *Heller*, 554 U.S. at 626, and citing *McDonald*, 561 U.S. at 786 (plurality)).

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of *law-abiding*, *responsible* citizens" to possess a handgun in the home for self-defense. 554 U.S. at 635 (emphasis added). The Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626. Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that it "made . . . clear" in *Heller* that its "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald*, 561 U.S. at 786 (plurality) (quoting *Heller*, 554 U.S. at 626).

Following *Heller* and *McDonald*, and expressly incorporating as law their discussions ratifying "longstanding prohibitions on the possession of firearms by felons," the Second Circuit held that § 922(g)(1) "is a constitutional restriction on the Second Amendment rights of convicted

felons." *Bogle*, 717 F.3d at 281-82.[2]  Nothing since *Bogle* has placed this conclusion in doubt. *See*, *e.g.*, *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) (citing *Bogle* as good law).

##### B.    *Bruen* Does Not Undermine Section 922(g)(1) or *Bogle*

The defendant argues that the Supreme Court's decision in *Bruen* abrogated the jurisprudence upholding the constitutionality of Section 922(g)(1). (Def. Br. at 4-10). That argument would require the Court to disregard not only *Heller* and *McDonald*, but also *Bruen* itself.

*Bruen* considered a New York State law that provided for a discretionary "proper cause" licensing regime to carry a firearm outside the home, which the Second Circuit had upheld using the means-end framework adopted by several courts of appeals to adjudicate Second Amendment challenges.  597 U.S. at 8-13, 17.  The Supreme Court reversed, rejecting the means-end test, *see id.* at 17-24, and reaffirming that "*Heller*'s methodology centered on constitutional text and history." *Id.* at 22.  Thus, "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

---

[2] The Second Circuit is not alone.  *See*, *e.g.*, *United States v. Roszkowski*, 700 F.3d 50, 58-59 (1st Cir. 2012); *United States v. Moore*, 666 F.3d 313, 318-19 (4th Cir. 2012); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009), *abrogated on other grounds by Borden v. United States*, 593 U.S. 420 (2021); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 693-94 (7th Cir. 2010); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *Schrader v. Holder*, 704 F.3d 980, 991-92 (D.C. Cir. 2013).  *See also Bogle*, 717 F.3d at 281-82 ("We therefore join every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons.").

In *Rahimi*, the Supreme Court clarified this analogical inquiry. Noting that some courts had "misunderstood the methodology of our recent Second Amendment cases," the Court rejected a historical inquiry that would leave "a law trapped in amber." 144 S. Ct. at 1897. "[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. Instead of hunting for a precise historical precursor, courts should instead consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* (emphasis added); *accord id.* at 1904 (Sotomayor, *J.*, concurring). As Justice Barrett elaborated in her concurrence, "[t]o be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart." *Id.* at 1925 (Barrett, *J.*, concurring) (emphasis in original). "Analogical reasoning under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." *Id.* Critically, this principles-based analysis holds true even where addressing a problem that has existed since the founding, such as (in *Rahimi*) "individuals who pose a credible threat to the physical safety of others." *Id.* at 1898 (majority opinion).

Moreover, neither *Bruen* nor *Rahimi* undermined precedent in the Courts of Appeals upholding Section 922(g)(1). *See United States v. Dubois*, 94 F.4th 1284, 1291-93 (11th Cir. 2024) (holding that pre-*Bruen* circuit precedent upholding Section 922(g)(1) remains binding); *Vincent v. Garland*, 80 F.4th 1197, 1199-1202 (10th Cir. 2023) (same), *vacated* --- S. Ct. ----, 2024 WL 3259668 (2024);[3] *United States v. Sitladeen*, 64 F.4th 978, 987 (8th Cir. 2023) (same with respect to Section 922(g)(5)(A)); *United States v. Lucha El Libertad*, 681 F. Supp. 3d 102, 107 (S.D.N.Y. 2023) (noting that prior Second Circuit holding that Section 922(a)(3) "does not on its face regulate

---

[3] Although this decision has been vacated and remanded for further consideration in light of *Rahimi*, it retains its persuasive authority.

core Second Amendment conduct survives *Bruen* unscathed"); *but see United States v. Duarte*, 101 F.4th 657, 663-70 (9th Cir. 2024), *vacated, rehearing en banc granted,* 2024 WL 3443151 (9th Cir. July 17, 2024) (concluding, in panel opinion that has now been vacated pending rehearing en banc, that *Bruen* abrogated *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010)).  *Bogle* is wholly consistent with the *Bruen* framework, including as clarified by *Rahimi*, and thus remains good law.[4]

Critically, the Second Circuit did not employ in *Bogle* the means-end test later disapproved in *Bruen*; instead, the Court applied the reassurances of *Heller* and *McDonald* regarding the validity of "longstanding prohibitions on the possession of firearms by felons."  *Bogle*, 717 F.3d at 281 (quoting *Heller*, 554 U.S. at 626).  And as the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* are supported by history. *Bruen*, 597 U.S. at 21 (explaining that in *Heller*, the Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); *New York State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, *J.*, joined by Thomas

---

[4] The defendant's citation to out-of-district cases does not suggest otherwise. (Def. Br. at 4-5.)  In *Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir 2023) the Seventh Circuit remanded a constitutional challenge to section 922(g)(1) and instructed the district court to undertake a historical analysis consistent with *Bruen*. In *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *vacated,* --- S. Ct. ----, 2024 WL 3259662 (2024) the Fifth Circuit analyzed a different subsection of 18 U.S.C. § 922. Most of the district court cases cited by the defense are similarly off point. *See United States v. Connelly*, 668 F. Supp. 3d 662 (W.D. Tex. 2023) (finding 18 U.S.C. § 922(g)(3) constitutional as applied); *United States v. Harrison*, 654 F. Supp. 3d 1191 (W.D. Okla. 2023) (addressing 18 U.S.C. § 922(g)(3)); *United States v. Hicks*, 649 F. Supp. 3d 357 (W.D. Tex. 2023) (addressing 18 U.S.C. § 922(n)); *Firearms Policy Coal. v. McCraw*, 623 F. Supp. 3d 740 (N.D. Tex. 2022) (addressing a Texas statute prohibiting 18-20-year-olds from possessing firearms).  One even undercuts the defendant's position.  *See*, *United States v. Price*, 635 F. Supp. 3d 455, 464 (S.D.W. Va. 2022) (upholding 18 U.S.C. § 922(g)(1) as constitutional). The remaining cases cited by the defendant in his string cite are neither controlling nor persuasive. *See United States v. Prince*, No. 22 CR 240, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023); *United States v. Freeman*, No. 23 CR 158, 2023 WL 7325934 (N.D. Ill. Nov. 7, 2023); *United States v. Bullock*, 679 F. Supp. 3d 501 (S.D. Miss. 2023).

and Gorsuch, *JJ.*, dissenting) (explaining that *Heller* and *McDonald* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals"); *Heller*, 554 U.S. at 626, 635 (acknowledging that "permissible" regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported by "historical analysis" and "historical justifications"). It would therefore make no sense to conclude that *Bruen* meant, *sub silentio*, to discard *Heller*'s and *McDonald*'s repeated admonitions that felon-disarmament is wholly consistent with the Second Amendment. *See Heller*, 554 U.S. at 626, 631; *McDonald*, 561 U.S. at 786 (plurality).

Indeed, eight members of the *Bruen* Court have made clear that *Bruen* did not upend the Court's prior recognition of lawful firearm regulations. In *Bruen* itself, six justices took pains to emphasize that the decision did nothing to upset *Heller*'s and *McDonald*'s reassurances. *See* 597 U.S. at 72 (Alito, *J.*, concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . , about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 80-81 (Kavanaugh, *J.*, joined by Roberts, *C.J.*, concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "longstanding prohibitions on the possession of firearms by felons" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626, 636)); *id.* at 129 (Breyer, *J.*, joined by Sotomayor and Kagan, *JJ.*, dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms). In addition, two years earlier, Justice Thomas and Justice Gorsuch "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *City of New York*, 140 S. Ct. at 1540-41

(Alito, *J.*, joined by Thomas and Gorsuch, *JJ.*, dissenting). Thus, eight of the nine members of the *Bruen* Court (including seven current members of the Court) have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes.

Moreover, the Supreme Court's express limitations of the scope of its holdings—which help couch the boundaries of the test in *Heller* that was repeated in *McDonald* and clarified in *Bruen*—are not dicta. *See*, *e.g.*, *United States v. Huet*, 665 F.3d 588, 600 n.11 (3d Cir. 2012), *abrogated on other grounds by Rehaif v. United States*, 588 U.S. 225 (2019) ("Although some of our sister circuits have classified the 'presumptively lawful' language in *Heller* as dicta, . . . we disagree."); *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) ("[T]o the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta") (emphasis in original).[5] However, even if the language upholding the constitutionality of felon-disarmament laws were dicta, it must still "be given considerable weight and [cannot] be ignored in the resolution of the" issue before this Court. *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975); *see also*, *e.g.*, *United States v. Colasuonno*, 697 F.3d 164, 179 (2d Cir. 2012) (acknowledging that it is the "usual obligation to accord great deference to Supreme Court dicta"). In any event, when the Second Circuit adopted the reassurances of *Heller* and *McDonald* as the core basis of its holding in *Bogle*, it became binding in this Circuit.

---

[5] Notably, in *Bruen*, Justice Kavanaugh—joined by Chief Justice Roberts—"wr[o]te separately to underscore two important points about the limits of the Court's decision," one of which was that "the Second Amendment allows a 'variety' of gun regulations," including prohibitions on convicted felons possessing firearms. *Bruen*, 597 U.S. at 79-81 (Kavanaugh, *J.*, joined by Roberts, *C.J.*, concurring). Without Justice Kavanaugh and Chief Justice Roberts, the *Bruen* opinion would not have commanded a majority; accordingly, even if *Heller*'s limitation was once arguably dicta, it is controlling after *Bruen*.

Accordingly, nothing in *Bruen* or *Rahimi* undercuts *Bogle*.  By following *Heller* and *McDonald*, the Second Circuit necessarily upheld Section 922(g)(1) because such a regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.  By reaffirming *Heller* and *McDonald*, and counseling courts to adhere more closely to those cases, *Bruen* effectively reaffirmed *Bogle*, which drew directly from *Heller* and *McDonald*, and, in any event, did not overrule it.  *See, e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court.").

Both the Tenth and Eleventh Circuits have determined that their pre-*Bruen* precedents upholding Section 922(g)(1) without relying on means-end scrutiny survive *Bruen* and remain binding.  In *Vincent*, 80 F.4th 1197, the Court found that it was bound by its prior ruling in *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009).  The Court noted that *McCane*, like *Bogle*, had not employed the two-step test abrogated by *Bruen*. *Vincent*, 80 F.4th at 1201. The Court additionally found that the *Bruen* decision, far from suggesting the invalidity of Section 922(g)(1), in fact suggested the continuing vitality of pre-*Bruen* decisions upholding the law's constitutionality: "Given the six Justices' reaffirmation of the *Heller* language and the Court's apparent approval of 'shall-issue' regimes and related background checks, we conclude that *Bruen* did not indisputably and pellucidly abrogate our precedential opinion in *McCane*."  *Id.* at 1202. The Eleventh Circuit ruled similarly in *United States v. Dubois*, 94 F.4th 1284 (11th Cir. 2024), that it was bound by its prior ruling in *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010), upholding the constitutionality of § 922(g)(1).  "*Bruen* did not abrogate *Rozier*. Because the Supreme Court made it clear in *Heller* that its holding did not cast doubt on felon-in-possession

prohibitions, and because the Court made it clear in *Bruen* that its holding was in keeping with *Heller*, *Bruen* could not have clearly abrogated our precedent upholding section 922(g)(1)." *Dubois*, 94 F.4th at 1293.  The court further noted that *Rozier*, like *Bogle*, had not employed the two-step test abrogated by the Supreme Court in *Bruen*.  *See id.*

Thus, as every judge within this Circuit to consider the question has concluded, *Bogle* remains binding on courts within this Circuit post-*Bruen*.  *See, e.g.*, *Young*, 2024 WL 3184709, at *3-4 (holding that neither *Bruen* nor *Rahimi* undermined *Bogle*); *United States v. Gonzalez*, No. 23 Cr. 18 (MKV), 2024 WL 96517 at *5 (S.D.N.Y. Jan. 9, 2024) ("Every court in this District that has considered whether *Bogle* survives *Bruen* has reached the same conclusion."); *accord United States v. Cruz*, No. 24 Cr. 145 (VEC), 2024 WL 2867460, at *2 (S.D.N.Y. June 5, 2024) (denying motion to dismiss "[b]ecause there is nothing in *Bruen* that alters the rationale of *Bogle*"); *United States v. Petteway*, No. 24 Cr. 80 (AT), 2024 WL 3105006, at *1 (S.D.N.Y. June 24, 2024) (denying motion to dismiss because "[t]his Circuit's holding in *Bogle* remains good law in the wake of *Bruen*."); *United States v. Aramboles*, No. 23 Cr. 643 (AS), 2024 WL 813466, at *1-2 (S.D.N.Y. Feb. 27, 2024); *United States v. D'Angelo*, No. 23 Cr. 327, Dkt. 26 (PGG), and *United States v. Boone*, No. 23 Cr. 427 (PGG), 2023 WL 9056404 (S.D.N.Y. Dec. 31, 2023); *United States v. Williams*, No. 23 Cr. 218 (VSB), 2023 WL 8355891, at *3 (S.D.N.Y. Dec. 1, 2023); *United States v. Fayton*, No. 23 Cr. 01 (JLR), 2023 WL 8275924, at *5 (S.D.N.Y. Nov. 30, 2023); *United States v. Mitchell*, No. 23 Cr. 198 (ALC), 2023 WL 8006344 at *2 (S.D.N.Y. Nov. 17, 2023); *United States v. Nelson*, No. 22 Cr. 436 (JGK), 2023 WL 6520378, at *2-3 (S.D.N.Y. Oct. 4, 2023); *United States v. Acevedo*, No. 22 Cr. 474 (KPF) (S.D.N.Y. Sept. 14, 2022) (oral ruling); *United States v. Espinal*, No. 23 Cr. 264 (SHS) (S.D.N.Y. Sept. 12, 2022) (oral ruling); *United*

*States v. Davila*, 688 F. Supp. 3d 81, 84 (S.D.N.Y. 2023) (JSR); *United States v. Hampton*, 676 F. Supp. 3d 283, 301 (S.D.N.Y. 2023) (JPC).

These decisions join the unanimous rulings of judges in this District that the clear reasoning of *Heller*, *McDonald*, and *Bruen* foreclose any motion to dismiss a Section 922(g)(1) indictment. *See United States v. Morales*, No. 24 Cr. 84 (PAE), 2024 WL 3345982, at * 1-2 (S.D.N.Y. July 8, 2024); *United States v. Abreu*, No. 23 Cr. 67 (NSR), 2023 WL 6541302, at *3-4 (S.D.N.Y. Oct. 6, 2023); *United States v. Barnes*, No. 22 Cr. 43 (JPO), 2023 WL 2268129 (S.D.N.Y. Feb. 28, 2023); *United States v. Centeno*, No. 22 Cr. 542 (DLC) (S.D.N.Y. Feb. 6, 2023); *United States v. King*, 634 F. Supp. 3d 76, 83 (S.D.N.Y. 2022); *United States v. Patterson*, No. 19 Cr. 231 (S.D.N.Y. Sept. 9, 2022) (oral ruling); *United States v. Adams*, No. 20 Cr. 628 (AKH) (S.D.N.Y. Aug. 10, 2022); *United States v. Maurice*, No. 22 Cr. 48 (VB) (S.D.N.Y. Jul. 14, 2022) ("I won't call it a frivolous motion, but I will point out that in *Bruen* and, more importantly, in the earlier cases like *Heller* and *McDonald* dealing with the Second Amendment, the Supreme Court – majority of the Supreme Court has been absolutely crystal clear, here's the language, 'nothing in our opinion should be taken to cast [doubt] on the long-standing prohibitions on the possession of firearms by felons.' I mean, I don't know what else they could say and that was said again in this case [*Bruen*], so I'm not sure why you would even make this motion other than to, I suppose, preserve the record, but the motion is denied.").

### C.    Text and History Confirm that Section 922(g)(1) Is Consistent with the Second Amendment

Even if this Court were to ignore *Bogle* and consider the constitutionality of Section 922(g)(1) anew, the text and historical context of the Second Amendment make clear that Section 922(g)(1) is constitutional.

1.    **The Text of the Second Amendment and Its Historical Context Show that a Convicted Felon May Be Prohibited from Possessing Firearms**

Felon-disarmament laws are consistent with the Second Amendment's text, as historically understood.  The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.  As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses.  Put simply, a convicted felon categorically falls outside the class of law-abiding persons to whom the Second Amendment applies.

Courts of Appeals have reached this conclusion both before and after *Bruen*.  *See United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023) (concluding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons"), *vacated* --- S. Ct. ----, 2024 WL 3259675 (July 2, 2024);[6] *Medina v. Whitaker*, 913 F.3d 152, 157-61 (D.C. Cir. 2019) ("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history," making it unnecessary to "reach the second"—now abrogated—"step" of that court's pre-*Bruen* precedent); *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) (holding that "conviction of a felony

---

[6] Although this decision has been vacated and remanded for further consideration in light of *Rahimi*, it retains its persuasive authority.

necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment"); *Range v. Attorney General*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam) ("*Range I*") (holding that "those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses" can be prohibited from possessing firearms consistent with the Second Amendment's text and history, "whether or not those crimes are violent"), *vacated upon grant of rehearing en banc*, 56 F.4th 992 (3d Cir. 2023).[7]

The Second Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 597 U.S. at 31, who are entitled to be "members of the political community." *Heller*, 554 U.S. at 580. Section 922(g)(1) imposes a status-based restriction on who can possess firearms that reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment and are subject to disarmament laws on that basis are not "ordinary, law-abiding, adult citizens," *Bruen*, 597 U.S. at 31, who are "members of the political community," *Heller*, 554 U.S. at 580.

Consistent with that understanding, legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their criminal conduct and convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative*

---

[7] Although the *en banc* Third Circuit vacated the panel opinion in *Range* and ultimately reached a contrary result, the panel opinion retains its persuasive value—particularly with respect to its discussion of the historical record. *See Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (*Range II*) (en banc), *vacated* --- S. Ct. ----, 2024 WL 3259661 (2024).

*Power of the States of the American Union* 28-29 (1868).  Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 & n.* (1998) (explaining these were historically understood as "political rights" and, in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

Indeed, it remains the case that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote."  *Medina*, 913 F.3d at 160 (citing 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement)); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Just as Congress and the States have required persons convicted of felonies to forfeit other rights belonging to members of the political community, Section 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction," *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, *J.*, concurring in most of the judgment).  While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," the decision in "*Heller* recognizes an exception for some Americans—to respect 'longstanding prohibitions on the possession of firearms by felons and the mentally ill,'" exceptions that are "historically grounded and sensible.  *Id.* (quoting *Heller*, 554 U.S. at 626-27); *see also, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Bena*, 664

F.3d 1180, 1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam).

Although "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id.* at 581; *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 221) (Menashi, *J.*, concurring in the judgment), but certain noncitizens *are* among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271-73 (1990). The same is true of felons. Other constitutional provisions use "the people" in a manner that excludes felons who have forfeited the rights that come with membership in the polity. Such felons are not among "the people" who adopted the Constitution, *see* U.S. Const. Pmbl; or "the people" who are entitled to elect members of Congress, *see* U.S. Const. Art. I, § 2, cl. 1; amend. XVII, cls. 1-2; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

*Bruen* makes plain that those, like convicted felons, who are not law-abiding cannot successfully challenge laws that apply to them based on that status. The Supreme Court made "repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Jackson*, 69 F.4th at 503 (collecting citations); *see also Range I*, 53 F.4th at 271 (observing that the *Bruen* "majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times"). In one passage, the Court connected its explanation that the plaintiffs were "part of 'the people' whom the Second Amendment protects" with its observation that they were "ordinary, law-abiding, adult citizens."

16

*Bruen*, 597 U.S. at 31-32.  In another passage, *Bruen* approved "shall-issue" licensing regimes, explaining that such regimes "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law- abiding, responsible citizens.'"  *Id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635).  In yet another passage, *Bruen* explained the historical analysis focuses on "how and why" a challenged regulation and a potential analogue each "burden a *law-abiding* citizen's right to armed self-defense."  *Id.* at 29 (emphasis added).  Applying that historical test as the Court has described it would be superfluous where, as here, the challenged law applies only to those who are not law-abiding—and thus does not impose *any* "burden" on "a law-abiding citizen's right to armed self-defense."  *Id.*

That non-law-abiding citizens can be disarmed under a proper understanding of the constitutional text also explains the Court's specific assurances regarding the permissibility of prohibitions on the possession of firearms by felons.  *See Heller*, 554 U.S. at 626-27, 627 n.26, 635.  In *Heller*, the Supreme Court parsed the text of the Second Amendment and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home "[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights."  *Id.* at 635.  The defendant, by contrast, is a felon and therefore is "disqualified from the exercise of Second Amendment rights."  *Id.*; *see also id*. at 631 (explaining that District of Columbia had "apparently" used word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane").

The Second Circuit has recognized the same limitation on the Second Amendment's scope in the context of challenges to other regulations: "As to the first step of the analysis, [this Court] ha[s] interpreted the core Second Amendment right identified in *Heller* to be the 'right of *law-abiding, responsible citizens*.'"  *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020) (quoting *Jimenez*, 895 F.3d at 234; emphasis in *Jimenez*); *accord, e.g.*, *United States*

*v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (framing inquiry as whether and to what extent challenged prohibition burdens "the ability of *law-abiding citizens* to possess and use a firearm for self-defense (or for other lawful purposes)" (emphasis added)).   And in *Bogle*, of course, the Second Circuit rejected a facial challenge to Section 922(g)(1) based upon *Heller*'s and *McDonald*'s reassurances grounded in history. 717 F.3d at 281-82.   Laws such as Section 922(g)(1) are therefore constitutional under the Second Amendment's text as informed by a variety of "historical justifications."   *Heller*, 554 U.S. at 635.

### 2.   Section 922(g)(1) Is Consistent with This Nation's Historical Tradition of Firearms Regulation

To the extent that the defendant's Second Amendment rights are implicated at all, a review of "this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, confirms the validity of laws disarming people because of felony convictions, regardless of whether the felonies were violent.   Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the scope of the Second Amendment and the power of legislatures.   *Id.* at 30 (emphasis omitted).   Two categories of historical evidence are particularly pertinent: (a) laws demonstrating that the right to bear arms has historically been understood to attach to law-abiding individuals, not convicted felons; and (b) laws demonstrating that the right to bear arms may be restricted categorically based upon legislative determinations.

### a.   The Right to Bear Arms Has Historically Extended Only to Law-Abiding Individuals

In England before the Founding, felons had no right to keep and bear arms.   The standard penalty for a felony was death.   *See* 4 William Blackstone, *Commentaries on the Laws of England* 98 (1769).   That punishment extended even to non-violent felonies, such as smuggling, *id.* at 155; fraudulent bankruptcy, *id.* at 156; violating quarantine, *id.* at 162; forging a marriage license, *id.*

at 163; and cutting down a cherry tree, *id.* at 4. A felon awaiting execution would be held in prison —where he would have no access to arms. *See id.* at 131 (discussing a statute making it unlawful to provide "any arms" to a "prisoner in custody for treason or felony"). A conviction would also usually result in the escheat of the felon's estate and the forfeiture of all his goods and chattels— including, of course, his arms. *See id.* at 379-82. A convicted felon, finally, was deemed "already dead in law" even before his execution. *Id.* at 374. That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, to marry"; indeed, "his physical conditions were such that he could do none of these things." *Id.* at 156 (Earl, *J.*, dissenting) (emphasis added).

Early Americans accepted that legislatures had the power to subject felons to similar deprivations. Thus, "death was the standard penalty for all serious crimes at the time of the founding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019); *accord Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, *J.*, joined by Scalia, *J.*, concurring in the judgment) (noting that capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "the standard penalty for all serious crimes"). As in England, the death penalty extended even to non-violent crimes, such as forgery and horse theft. *See Medina*, 913 F.3d at 158. Many States also subjected certain felons to forfeiture of their estates or their goods and chattels. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 15 nn. 275-76 (2014) (collecting statutes). And at least some States enacted statutes carrying forward the common-law doctrine of civil death. *See, e.g.*, *In re Deming*, 10 Johns. 232, 233 (N.Y. 1813) (per curiam). As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone

facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.

Because the traditional punishment for serious crimes was death, early legislatures had little occasion to enact laws explicitly disarming those convicted of such crimes. They did, however, enact laws disarming people who had committed certain offenses that were not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 Blackstone, *Commentaries on the Laws of England* 55 (1769); *see* 3 Jac. 1, c. 5, § 16 (1605) (Eng.). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982). And a 1775 Connecticut statute provided that anyone convicted of "libel[ing] or defam[ing]" certain colonial resolutions "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (Charles J. Hoadly ed., 1890). That legislatures disarmed people who had committed those minor offenses suggests, *a fortiori*, the constitutionality of disarming those who commit felonies.

Moreover, some Founding Era sources expressly recognized that the right to bear arms extended only to law-abiding individuals. In 1780, for example, the Town of Williamsburg, Massachusetts, adopted a resolution proclaiming: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Lawfull Subjects of Government we Ought Never to be deprived of them." The Popular Sources of Political Authority:

Documents on the Massachusetts Constitution of 1780, at 624 (Oscar Handlin & Mary Handlin eds., 1966).

The founders also understood that the precise type of regulation challenged here is constitutional. Anti-Federalists at the Pennsylvania ratifying convention proposed a bill of rights that, among other things, forbade "disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." 2 The Documentary History of the Ratification of the Constitution 598 (Merrill Jensen ed., 1976).

### b. The Right to Bear Arms May Be Restricted Categorically

By the time of the Second Amendment's ratification in 1791, there was a robust tradition of legislatures exercising broad "discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms." *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 274 (recognizing historical authority to "categorically disqualif[y] people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact").

*England*. Because the Second Amendment "codified a right inherited from our English ancestors," English legal tradition sheds light on the scope of the "right secured by the Second Amendment"—which, as with the English right, "is not unlimited." *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. One law, for example, provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). Enacted shortly after the Glorious

Revolution of 1688—when the Protestants King William and Queen Mary succeeded the Catholic King James II—that statute reflected the new government's perception that Catholics who refused to renounce their faith were among "those who are unwilling to obey the government and its laws." *Jackson*, 69 F.4th at 502; *see Range I*, 53 F.4th at 275 (recognizing Catholics were disarmed based on "perceived disrespect for and disobedience to the Crown and English law").

That example is particularly relevant because the same Parliament "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," which similarly drew a religion-based distinction, among other limitations. *Bruen*, 597 U.S. at 44 (quoting *Heller*, 554 U.S. at 593). "Englishmen had never before claimed the right of the individual to arms." *Id.* at 44-45. And when they first formally claimed that right, the English ensured that the government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the class's members would not abide by the law.

***Colonial America***. The American colonies inherited the English tradition of broad legislative authority to disarm classes of people viewed as untrustworthy or dangerous. Firearm regulations directed toward disarming Native Americans and Black people were pervasive.[8] Other

---

[8] *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006); *see also, e.g.*, *Laws and Ordinances of New Netherland*, 1638-1674, at 18-19 (1868) (1639 New Netherland law); *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); *Records of the Colony of New Plymouth* 173 (1856) (1675 Plymouth law); *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); *The Statutes at Large; Being a Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); *The Laws of Maryland, With the Charter, the Bill of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments* 117-18 (1811) (1715 Md. Law); *The Public Records of the Colony of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From the Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law);

colonial laws "followed longstanding English practice" by disarming Catholics who refused to take an oath of allegiance. *Perez*, 6 F.4th at 462 (Menashi, *J.*, concurring in the judgment) (citing Virginia law); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020) (citing Maryland, Virginia, and Pennsylvania laws). While those specific "categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms." *Jackson*, 69 F.4th at 503. Moreover, "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws." *Range I*, 53 F.4th at 276 (collecting examples).

   ***The Revolutionary War***.  During the Revolutionary War, American legislatures passed numerous laws disarming individuals who failed to demonstrate loyalty to the emergent government. *Jackson*, 69 F.4th at 503; *see also Range I*, 53 F.4th at 277 (observing that legislatures "disarm[ed] non-violent individuals because their actions evinced an unwillingness to comply with the legal norms of the nascent social compact").  As described above, an early example was a 1775 Connecticut law providing that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June,*

---

*A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia from Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law).

*1776*, at 1993 (1890) (1775 Conn. law).  In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort.  4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776).  At least six of the governments enacted legislation in that vein.  *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law).

    ***Ratification Debates***.  The historical background of the Second Amendment's adoption demonstrates that the founders viewed the constitutional right to bear arms as compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law.  One "Second Amendment precursor[ ]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is particularly instructive.  *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).  When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the . . . debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights."  2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971).  Although the Antifederalists did not persuade a majority of the convention to reject ratification on that basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second

Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628. The Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). Thus, the founding generation recognized that both "crimes committed" and "real danger of public injury" can independently supply grounds for a legislature to prohibit firearm possession. *See Medina*, 913 F.3d at 158-59 ("The use of the word 'or' indicates that criminals, in addition to those who posed a 'real danger' (such as the mentally ill, perhaps), were proper subjects of disarmament."); *Range I*, 53 F.4th at 280 (observing that the proposal "distinguished between criminal convictions and dangerousness, and provided that *either* could support disarmament").

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 2 Schwartz, *supra*, at 675, 681 (emphasis added). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 758, 761.

The Second Amendment as adopted does not include the same language as those proposals. But it would have been "obvious" to the founders that certain groups, including "the felon," Cooley, *supra*, at 29, could be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592); *see also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a

constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because that limitation "was understood").  Given the language of the influential proposals and the apparent absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals, courts "can assume it settled" that such regulations are "consistent with the Second Amendment."  *Bruen*, 597 U.S. at 30 (discussing proper inference to draw from history as to "sensitive places," which "yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited").

### c.    Comparison to Section 922(g)(1)

The historical tradition surveyed above demonstrates Section 922(g)(1)'s constitutionality. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 597 U.S. at 29.  Of course, Section 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it applies only to people who have removed themselves from the law-abiding citizenry by committing offenses punishable by more than one year of imprisonment.  In any event, the historical record shows that felons were historically subjected to dispossession of firearms—in addition to far more severe consequences, including estate forfeiture and capital punishment.  History additionally shows that legislatures disqualified categories of people from possessing firearms, just as felon-dispossession statutes do today, based on legislative judgments that the disarmed people could not be counted upon to be law-abiding members of the polity.  Accordingly, the Government has satisfied its burden of "identify[ing] a well-established and historical *analogue*" for Section 922(g)(1).  *Id.* at 30.  The Government has above identified multiple laws disarming felons (beyond those that subjected them to death or estate forfeiture and thus, *a fortiori*, disarmament), discussing statutes disarming those convicted of specific felonies from England,

Virginia, and Connecticut. And *Rahimi* reinforced that courts should consider "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," rather than leaving "a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897 (emphasis added).

### D.    The Defendant Falls Squarely Within the Historically Excludable Class

The defendant also raises, but does not elaborate on, an as-applied challenge to Section 922(g)(1) (Def. Br. 10-11), which is likewise meritless. The Second Circuit has not suggested that Section 922(g)(1) is subject to an as-applied Second Amendment challenge. *See Bogle*, 717 F.3d at 282-83 (holding that "§ 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons"). And this Court should follow the several Courts of Appeals that have concluded that Section 922(g)(1) is constitutional in all of its applications, thus foreclosing as-applied challenges. *See United States v. Massey*, 849 F.3d 262, 266 (5th Cir. 2017); *Rozier*, 598 F.3d at 771; *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009). As multiple courts have recognized, "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)," *Jackson*, 69 F.4th at 502, and Section 922(g)(1) is constitutional without regard to considerations such as the location or claimed purpose of the firearm possession, *United States v. Williams*, 24 F.4th 1209, 1211 (8th Cir. 2022), or the defendant's "present contributions to his community, the passage of time, or evidence of his rehabilitation," *Medina*, 913 F.3d at 160-61.

The Second Amendment "permits categorical regulation of gun possession by classes of persons—*e.g.*, felons and the mentally ill—rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011). "A prohibition on firearm ownership . . . is a reasonable consequence of a felony conviction that the legislature is entitled to impose without undertaking the painstaking case-by-case assessment of" considerations like "present contributions to his community, the passage of time, or evidence of his rehabilitation." *Medina*, 913 F.3d at 160-61; *see also United States v.*

27

*Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) (warning that to permit "highly fact-specific" as-applied challenges to Section 922(g)(1) would necessitate consideration of "countless variations in individual circumstances" and thus "would obviously present serious problems of administration, consistency and fair warning").

Only two Courts of Appeals have suggested that an as-applied Second Amendment challenge to Section 922(g)(1) might be valid, and neither of the circumstances involved in those cases pertain here. The Third Circuit has noted that an as-applied challenge might be appropriate when "the legislatures classified the challengers' offenses as misdemeanors, the crimes were nonviolent, the punishments imposed were lenient, and other jurisdictions also classified similar crimes as misdemeanors." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 902 (3d Cir. 2020) (describing *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc)); *see also Range II*, 69 F.4th at 98. That view, even if it were correct (it is not), would not apply here, because the defendant has been convicted of multiple crimes that the New York State legislature has defined as felony offenses. With respect to the defendant's conviction for burglary in the third degree, in particular, the defendant was sentenced to a lengthy prison term (18 months to three years of imprisonment).

Similarly, in a now-vacated opinion, a Ninth Circuit panel entertained an as-applied challenge to 922(g)(1) where the defendant's underlying convictions "likely would have made him a misdemeanant at the Founding" or lacked a connection to an analogous Founding-era crime. *Duarte*, 101 F.4th at 691; *see* No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024) (vacating panel rehearing and ordering rehearing en banc). The Government respectfully submits that the panel opinion was wrongly decided and is unpersuasive. The panel erred first in disregarding the *Bruen* Court's repeated admonitions regarding the constitutionality of laws restricting possession of firearms by felons, and second by focusing granularly on the similarity between the specific

28

predicate felony offense and Founding-era felony offenses, rather than broadly on the power of legislatures to disarm those that the respective legislature—whether historical or modern—deemed to be dangerous or non-law-abiding.  This overly narrow focus on specific Founding-era felony offenses is inconsistent with *Rahimi*'s focus on "the principles underlying the Second Amendment." 144 S. Ct. at 1898.

Finally, even if an as-applied challenge were available here, it would fail.  In the two paragraphs meant to advance his as-applied challenge (Def. Br. 10-11), the defendant offers no argument based on any circumstance specific to him and his underlying felonies that make the application of Section 922(g)(1) unconstitutional as applied to him.  And the defendant's prior felonies—*i.e.*, his conviction for burglary in the third degree: illegal entry with intent to commit a crime, in violation of New York Penal Law § 140.20, and his conviction for robbery in the third degree, in violation of New York Penal Law § 160.05—are sufficiently serious that, even if an as-applied challenge were permissible, he could not succeed in advancing one.  Unlike in *Range II*, each of the defendant's prior felony convictions was, in fact, classified by the New York State legislature as a felony—reflecting a legislative determination about the seriousness of the offense and bringing the defendant squarely within the class of convicted felons whose rights Section 922(g)(1) permissibly restricts.  *See Range II*, 69 F.4th at 98 (stating that the defendant's prior conviction "was classified as a Pennsylvania misdemeanor"); *Mitchell*, 2023 WL 8006344, at *8 (distinguishing *Range* and observing that, "[g]laringly, [the] [d]efendant has three narcotics convictions, not a fraud misdemeanor").

In any event, there are important distinctions between the defendant in *Duarte* and the defendant in this case that render the now-vacated Ninth Circuit panel's opinion in *Duarte* inapplicable here.  Here, the defendant has been convicted of burglary in the third degree, in

violation of New York Penal Law § 140.20, and of robbery in the third degree, in violation of New York Penal Law § 160.05. Robbery in the third degree is a violent felony under New York law. "By its plain language, … New York's robbery statute includes as an element the use of violent force." *United States v. Pereira-Gomez*, 903 F.3d 155, 165 (2d Cir. 2018) (holding that attempted robbery under New York law is a crime of violence under the "force clause" of application note 1(B)(iii) to Section 2L1.2 of the 2014 United States Sentencing Guidelines). As to the defendant's burglary conviction, the crime of burglary is plainly serious and carries with it an inherent risk of confrontation that can lead to immediate violence. *United States v. Alaniz*, 69 F.4th 1124, 1130 (9th Cir. 2023) ("Like burglary or robbery, drug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence."). In sum, the defendant's prior felonies are serious and violent such that, even if an as-applied challenge were permissible here, he could not possibly succeed in advancing one. Accordingly, the now-vacated Ninth Circuit panel's opinion in *Duarte* does not suggest that an as-applied challenge by someone like the defendant should succeed.

Finally, the defendant, relying on *Rahimi*, argues in a footnote that Section 922(g) is unconstitutional as applied to him because there is no historical tradition that could support *permanently* disarming him individually. (Def. Br. at 4 n. 1). While in fact a facial challenge to the statute, this argument also fails. The Court in *Rahimi* was clear; it did not "undertake an exhaustive historical analysis of the full scope of the Second Amendment," and concluded "only" that the restriction in question was consistent with the Second Amendment. *Rahimi*, 144 S. Ct. at 1903. The Court did not create a new rule distinguishing temporary from permanent bans, as the defense suggests. On the contrary, the holding in *Rahimi* "bolsters § 922(g)(1)'s constitutionality." *Morales*, 2024 WL 3345982, at * 2 (collecting cases).

## **CONCLUSION**

For the reasons set forth above, the defendant's motion to dismiss the Indictment should be denied.


Dated: New York, New York
       October 28, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York

                    By:    _____
                              Benjamin M. Burkett
                              Assistant United States Attorney
                              (212) 637-2455